# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * * * * * *
RYAN L. SWICK and MARY M. SWICK,   \*
legal representatives and parents of their   \* No. 13-526V
deceased minor child, J.R.S.,   \* Special Master
 \* Christian J. Moran
   Petitioners,   \*
 \* Filed:  January 7, 2016
 \*
v.   \* Findings of fact; onset
 \*
 \*
SECRETARY OF HEALTH   \*
AND HUMAN SERVICES,   \*
 \*
   Respondent.   \*
* * * * * * * * * * * * * * * * * * * * * * * *

Richard H. Moeller, Berenstein, Moore, Heffernan, Moeller & Johnson, L.L.P.,
Sioux City, IA, for petitioners;
Ryan Daniel Pyles, United States Dep't of Justice, Washington, DC, for
respondent.

## UNPUBLISHED RULING FINDING FACTS[1]

On July 29, 2013, Ryan and Mary Swick filed a petition on behalf of their
deceased son, J.R.S., under the National Vaccine Injury Compensation Program
(the "Vaccine Program"), 42 U.S.C. § 300aa-10 through 34 (2012).  This ruling is
focused on resolving inconsistent factual details surrounding J.R.S.'s death on
August 11, 2011.  When special masters are confronted with discrepancies among
medical records and affidavits, they are encouraged to hold a hearing to evaluate

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17,
2002), requires that the Court post this ruling on its website.  Pursuant to Vaccine Rule 18(b), the
parties have 14 days to file a motion proposing redaction of medical information or other
information described in 42 U.S.C. § 300aa-12(d)(4).  Any redactions ordered by the special
master will appear in the document posted on the website.

the testimony of the affiants.  See Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779-80 (2006).  This has occurred.

## **Procedural History**

On July 25, 2011, J.R.S. received the hepatitis B, rotavirus, diphtheria-tetanus-acellular pertussis ("DTaP"), haemophilus influenzae type b, inactivated poliovirus (IPV), and pneumococcal conjugate vaccines.  Pet. ¶ 5.  Mr. and Mrs. Swick ("the Swicks" or "petitioners") allege a vaccination, or combination of vaccinations, caused J.R.S.'s death a month later.  Id. ¶¶ 21, 23.  To support their claim for compensation, petitioners filed medical records (exhibits 1-6, 8-10) and affidavits (exhibits 7, 15).

In addition to submitting the medical records and affidavits, petitioners were ordered to file an expert report outlining the basis of their theory.  Neurologist Dr. Walter Kozachuck's first report opined that J.R.S. died as a result of posterior reversible encephalopathy syndrome, which can begin soon after vaccination.  Exhibit 11 at 12.  The Secretary filed her Rule 4 report shortly after Dr. Kozachuck's report, and concluded there was insufficient evidence to prove petitioners are entitled to compensation.  Resp't's Rep. at 10.  With her report, the respondent submitted blog posts by Mrs. Swick dated April 26, 2012 (updated April 27, 2012) and February 20, 2012.  Exhibit A; exhibit B.

The case was then transferred to the undersigned.  Order, filed June 5, 2014.  Following the transfer, Dr. Kozachuck authored a supplemental expert report in response to the Secretary's Rule 4 report.  This report was filed on August 19, 2014.  The supplemental report concluded that additional autopsy studies are required to rule out sudden infant death syndrome (SIDS) as a cause of death and establish a more certain cause of death.  See exhibit 13 at 3.

After reviewing the filings in the case, the undersigned determined that there were factual discrepancies concerning the time period from J.R.S.'s vaccination through his death.  Specifically, differences exist between medical records, affidavits, blog posts, and manuscripts regarding J.R.S.'s temperament, cough, vomiting, and C-Phen intake, as well as what transpired the morning of J.R.S.'s death, and whether anyone else was ill in the Swicks' home around the time J.R.S died.

On October 30, 2014, a fact hearing was held to address factual discrepancies in the record by evaluating the testimony of the affiants.  Five people

testified.  The undersigned has considered their testimony as well as the documentary evidence.

Following the hearing, petitioners filed proposed findings of fact on December 22, 2014, which outline the chronology of events leading to J.R.S.'s death.  On January 20, 2015, respondent submitted her response to petitioners' proposed findings of fact.  The Secretary agreed with, or did not dispute, many of petitioners' proposed facts.  She did, however, object to certain proposed facts, in particular challenging the proposed timeline for J.R.S.'s symptom onset, and whether he was found with a blanket over his head, which affects whether asphyxia could be ruled out as a cause of death.  See Resp't's Resp. to Pet'rs' Proposed Findings of Fact at ¶¶ 26-28, 36-40, 47.  The facts still in dispute are the focus of the analysis below.

### Standard for Finding Facts

Petitioners are required to establish their case by a preponderance of the evidence.  42 U.S.C. § 300aa–13(1)(a).  The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition.  42 U.S.C. § 300aa–11(c)(2).  Medical records created contemporaneously with the events they describe are presumed to be accurate.  Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the problems of the patient.  Completeness is presumed due to a series of propositions.  First, when people are ill, they see a medical professional.  Second, when ill people see a doctor, they report all of their problems to the doctor.  Third, having heard about the symptoms, the doctor records what he or she was told.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete.  A notable example is Cucuras, in which the petitioners asserted that their daughter, Nicole, began having seizures within one day of

receiving a vaccination, although medical records created around that time suggested that the seizures began at least one week after the vaccination. Cucuras, 993 F.3d at 1527. A judge reviewing the special master's decision stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred." Cucuras v. Sec'y of Health & Human Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

Decisions by judges of the Court of Federal Claims have followed Cucuras in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date. See, e.g., Doe/70 v. Sec'y of Health & Human Servs., 95 Fed. Cl. 598, 608 (2010) (stating, "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), aff'd sub nom. Rickett v. Sec'y of Health & Human Servs., 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); Doe/17 v. Sec'y of Health & Human Servs., 84 Fed. Cl. 691, 711 (2008); Ryman v. Sec'y of Health & Human Servs., 65 Fed. Cl. 35, 41-42 (2005); Snyder v. Sec'y of Health & Human Servs., 36 Fed. Cl. 461, 465 (1996) (stating, "[t]he special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Frank during his life to date. Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), aff'd, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

The presumption that contemporaneously-created medical records are accurate and complete is rebuttable, however. For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a symptom first appeared despite the lack of a notation in a contemporaneous medical record. 42 U.S.C. § 300aa-13(b)(2). By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury. In such cases, special masters are expected to consider whether medical records are accurate and complete. To overcome the presumption that contemporaneous written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling." Blutstein

v. Sec'y of Health & Human Servs., No. 90-2808V, 1998 WL 408611, at \*5 (Fed. Cl. Spec. Mstr. June 30, 1998).

Special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims listed four such explanations.  Inconsistencies can be explained by: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  La Londe v. Sec'y Health & Human Servs., 110 Fed. Cl. 184, 203 (Fed. Cl. 2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

In weighing divergent pieces of evidence, special masters usually find contemporaneously-written medical records to be more probative than oral testimony.  Cucuras, 993 F.2d at 1528.  Testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate.  Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993).   However, compelling oral testimony may be more persuasive than written records.  Campbell, 69 Fed. Cl. at 779 ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct. 726, 733 (1991) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance."), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

The relative strength or weakness of the testimony of a fact witness affects whether this testimony is more probative than medical records.  An assessment of a fact witness's credibility may involve consideration of the person's demeanor while testifying.  Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

These criteria are considered in the analysis below.

## Summary of Undisputed Facts

The respondent does not dispute many of the underlying facts proposed by petitioners. The parties do not dispute the dates of J.R.S.'s birth (May 14, 2011), vaccinations (July 25, 2011), or date of death (August 11, 2011). They also do not dispute the location of the Swicks' home, the Swicks' education, the history of the Swicks' other children, and the account of J.R.S.'s birth and medical history up to his leaving the hospital. Resp't's Resp. to Pet'r's Proposed Findings of Fact at ¶¶ 1-9, 11-12. Respondent also did not dispute J.R.S.'s healthy appearance on May 28-30, 2011, or the history of J.R.S.'s vaccinations. Id. at ¶¶ 15, 24. Finally, the facts outlining the events beginning with arrival of the emergency medical technicians (EMTs) and proceeding through to J.R.S.'s autopsy were supported by medical records and not disputed by the parties. Id. at ¶¶ 41-45.

Two other proposed facts were not disputed by the respondent, although clarified. First is J.R.S.'s gestation at birth. Petitioners and respondent agree to 36 weeks and 3 days despite slight variations in the medical records. See id. at ¶ 10. Second is J.R.S.'s weight gain after birth. Respondent noted that J.R.S. lost weight after birth, but subsequently regained 3 ounces in 3 days, which led to the documented positive comments regarding his weight gain. Id. at ¶ 14.

## Discussion and Assessment of Parties' Arguments and Evidence

The parties dispute the facts in six general areas. Those areas are: (1) the degree, if any, to which J.R.S.'s temperament became more "fussy" after vaccination; (2) when J.R.S. began coughing after his vaccination; (3) the magnitude and characterization of J.R.S.'s oral expelling which occurred roughly four to five days before J.R.S.'s death; (4) whether J.R.S. ingested C-Phen; (5) the events that occurred from the time J.R.S. was taken to his bed the morning of August 11, 2011, until the arrival of the EMTs later that morning; and (6) whether anyone was ill in the Swicks' home immediately prior to J.R.S.'s death.

The submitted evidence is summarized below in six sections.

### J.R.S.'s Temperament before and after his July 25, 2011 Vaccinations

The Swicks have testified and stated in their affidavits that prior to J.R.S.'s July 25, 2011 vaccinations, he was a content and happy child, rarely fussy or colicky. See Tr. 15, 61 to 62; exhibit 7 at ¶ 6; exhibit 15 at ¶ 4. In contrast, after vaccination, J.R.S. was fussy, inconsolable, and had a decreased appetite. See Tr. 15, 61 to 62; exhibit 7 at ¶ 6; exhibit 15 at ¶ 4. Respondent argues that a shift in

J.R.S's temperament is not corroborated by the medical record as ample evidence shows the temperament issues identified by the Swicks pre-date J.R.S.'s vaccinations. Resp't's Resp. to Pet'r's Proposed Findings of Fact at ¶¶ 19-20, 26-27. To understand if J.R.S. experienced a temperament shift post-vaccination, it is necessary to look at the corresponding medical records for periods both before and after the July 25 vaccination.

### Temperament before the July 25, 2011 Vaccination

At a June 21, 2011 medical appointment, the doctor noted that J.R.S. was receiving more formula, but was fussier with formula than with breast milk. Exhibit 2 at 10. On June 23, 2011, Mrs. Swick called the doctor and reported J.R.S. was constipated and fussy. Id. at 13. On June 24, 2011, Mrs. Swick called the doctor again and reported fussiness. However, by June 28, 2011, Mrs. Swick reported J.R.S.'s "fussiness has greatly improved." Id. at 16, 19.

At the July 12, 2011 doctor's visit, Mrs. Swick reported that J.R.S. had a fever and was vomiting prior to his last bowel movement, and reported that those issues resolved with the bowel movement. Exhibit 2 at 22. As a result, J.R.S. was given a daily glycerin suppository to help with constipation. Id.

On July 25, 2011, J.R.S. was seen for a well child examination. Id. at 25. J.R.S. received his vaccinations at this examination. Id. at 27. The records from the examination also note J.R.S. was experiencing 2 A.M. to 7 A.M. crying episodes, and that the prescribed glycerin suppositories were helping his constipation. Id. at 25.

### Temperament after the July 25, 2011 Vaccination

Mrs. Swick testified that J.R.S.'s constipation returned during the two week period between July 25, 2011, and August 11, 2011. She stated: "[Constipation] was pretty constant. We were still using the suppositories, they just didn't seem to be working as well as they had before. He wasn't going regularly now. Now it could be every three or four days." Tr. 39.

Mrs. Swick further testified that J.R.S.'s outbursts and crying were random after he received his July 25, 2011 vaccinations. Tr. 24. She testified that J.R.S. previously cried only "when he was hungry or when his tummy hurt when he was constipated." Id. The distinction being drawn between J.R.S.'s pre- and post-vaccination outbursts is not clear based on the medical records or testimony. As discussed previously, prior to vaccination, principally between June 21, 2011, and

July 11, 2011, Mrs. Swick thought J.R.S. was fussier than normal, principally due to constipation. Exhibit 2 at 10-22. Then there was a break in uncharacteristic fussiness between July 11, 2011, and July 25, 2011, ostensibly because the constipation had subsided. See id. at 25.

Mrs. Swick's testimony states J.R.S. was constipated for multiple days at a time between July 25, 2011, and August 11, 2011. It would not be surprising for a constipated four-month-old baby to be fussy. Thus, Mrs. Swick's observation and testimony that J.R.S. was fussy is credited. However, Mrs. Swick was not persuasive in attempting to distinguish J.R.S.'s random outbursts and crying from those previously triggered by constipation.

The parties remain free, within the confines of these factual findings, to argue causation regarding J.R.S.'s temperament shifts.

<u>J.R.S's Cough</u>

The Swicks testified that J.R.S. developed a cough roughly five days after he received his July 25, 2011 vaccinations, and that the cough progressively got more frequent, though still intermittent. Tr. 22, 46 to 47, 65. They also testified that the cough progressed to the point that it would wake him up. Tr. 22, 65. In contrast to this testimony, respondent highlights the Iowa medical examiner's records, and multiple blog posts by Mrs. Swick, as fixing the onset of the cough much closer to the date of J.R.S.'s death. See exhibit 6 at 11; exhibit A at 2; exhibit B at 4.

Specifically, respondent relies on a notation in the medical examiner's August 11, 2011 report, which is contemporaneous with J.R.S.'s death. The medical examiner's report states: "coughing started 8-10-11 – coughed up / gagging clear phlegm – 0200 8/11/11." Exhibit 6 at 11. August 10, 2011, was 17 days after J.R.S.'s vaccination, and one day before his death.

Additionally, Mrs. Swick's February 2012 blog post, the closest in time to J.R.S.'s August 2011 death, does not mention J.R.S. having a cough, and the April 2012 blog post states: "I was a few weeks late on getting [J.R.S.] his shots, but the night we came home [July 25, 2011], [J.R.S.] had a slight fever, (normal), and then later developed a cough. The night he developed the cough he passed away." Exhibit A; exhibit B.

Respondent argues that if J.R.S. had a cough, it would have been mentioned in the February 2012 blog post, which is closest in time to J.R.S.'s death. Further, Mrs. Swick's April 2012 blog post, which is closer in time to J.R.S.'s death than

either her affidavit or testimony, puts J.R.S.'s cough onset as August 10, 2011, not days before.

The August 11, 2011 statement regarding the timing of the onset of J.R.S.'s cough states "coughing started 8-10-11." Exhibit 6 at 11. The specific onset date is clear. Although the Swicks provided this history in an extremely stressful situation, the preponderance of the evidence suggests the Swicks, as the diligent parents they are, would have noted all of J.R.S.'s coughing, even slight coughing, that began in proximity to the date of his death. There is no such notation of an earlier cough, and no explanation for the absence of the notation.

Due to the specificity and timeliness of the August 11, 2011 statement, its evidentiary value outweighs other contrary evidence about J.R.S.'s coughing. The February 2012 blog post contains no information about J.R.S.'s cough, but the lack of mention of a cough is not important because the Swicks agree he had a cough. See Murphy, 23 Cl. Ct. at 733. The April 26, 2012 blog post is consistent with the finding that the cough started on August 10, 2011. Mrs. Swick posted, "[t]he night he developed the cough he passed away." Exhibit A at 2. Although Mrs. Swick attempted to explain the April 26, 2012 blog post (Tr. 29 to 31), this testimony does not overcome the August 11, 2011 statement. See Cucuras, 993 F.2d at 1528. Therefore, the undersigned finds the preponderance of the evidence establishes that J.R.S.'s cough began on August 10, 2011.

## Oral Expelling Magnitude

Petitioners allege that J.R.S. had a significant vomiting incident four to five days before his death. Pet'rs' Proposed Findings of Fact at ¶ 33. Various testimony characterized J.R.S.'s vomit as "more than a baby would be expected [to vomit.]" Id. The basis for petitioners' assertion is the testimony of Mr. and Mrs. Swick and Mrs. Meyer. Mrs. Meyer is the wife of one of Mr. Swick's coworkers, and witnessed J.R.S.'s early August vomiting episode. The Secretary, in response, states one alleged episode of vomiting is insufficient to conclude that J.R.S. was suffering from an ongoing disease process. Resp't's Resp. to Pet'r's Proposed Findings of Fact at ¶ 33.[2]

The testimony presented by petitioners through Mr. Swick and Mrs. Meyer leaves no doubt that J.R.S. threw up, as opposed to spit up, and that the volume

---

[2] It appears the Secretary's response is focused on establishing as fact that the record is insufficient to conclude J.R.S. suffered from an ongoing disease process, not on disputing the magnitude of J.R.S.'s vomiting incident four to five days before his death. Resp't's Resp. to

produced relative to J.R.S.'s age and size was significant.  Tr. 73 to 74, 85 to 88.  It is unclear whether the Secretary is disputing these facts by citing Mrs. Meyer's testimony that she was "puked on a lot of times."  Resp't's Resp. to Pet'r's Proposed Findings of Fact at ¶ 33; Tr. 86.  Regardless, Mrs. Meyer's testimony as to her experience with children's vomiting supports her ability to recognize an anomalous quantity of vomit.

Petitioners ask for a finding that the incident Mrs. Meyer witnessed in early August was more severe than J.R.S.'s previous vomiting.  See Pet'rs' Proposed Findings of Fact at ¶ 33.  As pointed out by respondent, however, the record shows that Mr. Swick was not aware of J.R.S.'s prior vomiting.  Resp't's Resp. to Pet'r's Proposed Findings of Fact at ¶ 33; Tr. 81 to 82.  Additionally, Mrs. Meyer could not, and Mrs. Swick did not, testify to the magnitude of the vomit in early August 2011 relative to J.R.S.'s earlier vomiting.  While the evidence supports a finding that J.R.S. vomited four to five days prior to August 11, 2011, petitioners request a further finding that the quantity was very large, and therefore unique from previous vomiting episodes.  See Pet'rs' Proposed Findings of Fact at ¶ 33.  Probative evidence, however, does not support a finding that J.R.S.'s early August vomiting incident was unique.

Nonetheless, the parties remain free, within the confines of these factual findings, to argue the significance of J.R.S.'s early August vomiting.

### C-Phen

It is undisputed that the Swicks attempted to give J.R.S. roughly one-quarter milliliter of C-Phen for his cough on the morning of August 11, 2011.  Tr. 41.  However, while petitioners state that J.R.S. spit the entire amount out, respondent says such a statement is conclusory.  Resp't's Resp. to Pet'r's Proposed Findings of Fact at ¶ 35.  The active ingredients in C-Phen, chlorpheniramine and dextromethorphan, were part of the comprehensive toxicology panel performed on J.R.S.'s heart blood and were reported as negative.  Exhibit 6 at 20.  While the toxicology panel suggests that J.R.S. did not consume any C-Phen, the evidence is not definitive, as questions remain regarding the rate of metabolism of C-Phen.

---

Pet'r's Proposed Findings of Fact at ¶ 33.  Regardless, a factual finding comparable to what the Secretary is requesting is beyond what the testimony of the lay witnesses supports, or what the undersigned can find based on that testimony.  Such a finding is squarely in the realm of what an expert witness would opine on, as opposed to the lay witness testimony at issue in this hearing.

Therefore, the parties remain free, within the confines of these factual findings, to argue the significance of J.R.S.'s receiving C-Phen.

<u>The Morning of August 11, 2011</u>

Testimony surrounding the morning of August 11, 2011, concentrated on three main issues: (1) whether a blanket was covering J.R.S.'s face when he was found by Mrs. Swick; (2) how J.R.S. was laid to sleep; and (3) J.R.S.'s physiological condition when found. Issue one is analyzed and resolved below, while issues two and three remain unresolved. While unresolved, the clarifications provided below on issues two and three should assist the parties in directing their respective experts.

The parties dispute whether J.R.S. was found with a blanket covering his head. <u>See</u> Pet'r's Proposed Findings of Fact at ¶ 36; Resp't's Resp. to Pet'r's Proposed Findings of Fact at ¶ 36. Mrs. Swick testified that she found J.R.S. on his stomach, face sideways, with a blanket covering his body to roughly his armpits. Tr. 34, 57. These statements, however, represent a change in the petitioners' assertions. <u>Compare</u> Pet'rs' Proposed Findings of Fact at ¶ 36 (stating that "[t]here was nothing in contact with J.R.S.'s face; the blanket on him was covering his body below his armpits") <u>with</u> exhibit 4 at 2 (where the emergency medical service report states that Mrs. Swick found J.R.S. with a "blanket over [his] head"), <u>and</u> exhibit 7 at ¶ 15(f) (aff., dated July 23, 2013) (Mrs. Swick indicates that "there was a blanket on his head"). Additionally, respondent notes other documents which support that J.R.S.'s face was covered by a blanket when found by Mrs. Swick. Resp't's Resp. to Pet'r's Proposed Findings of Fact at ¶ 36 (citing exhibit 6 at 8 and 10, exhibit B at 3, and exhibit 19 at 5-6).

Though respondent has identified significant contemporaneous records and temporally closer statements that argue against Mrs. Swick's oral testimony, that evidence still must be balanced against the persuasiveness of Mrs. Swick's testimony. <u>See</u> <u>Reusser</u>, 28 Fed. Cl. at 523; <u>Campbell</u>, 69 Fed. Cl. at 779. Regarding this specific aspect of Mrs. Swick's testimony, the undersigned finds that the records created contemporaneously are more persuasive than Mrs. Swick's testimony years later.

As discussed previously, to overcome the presumption that contemporaneous written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling." <u>Blutstein</u>, 1998 WL 408611, at *5. Mrs. Swick's July 2013 affidavit and October 2014 oral testimony, however, are

inconsistent.  In the July 2013 affidavit, Mrs. Swick averred that the state medical examiner's report contained errors, to include that "there was a blanket on his head, but it was not wrapped around his head or situated in any other way that would have obstructed his breathing or caused suffocation."  Exhibit 7 at ¶ 15(f). In contrast, in October 2014 Mrs. Swick was asked, "[w]hen you found [J.R.S.], how far up was the blanket on his body?"  To which Mrs. Swick responded, "[m]aybe his armpits."  Tr. 57.  The lack of consistency about the location of the blanket diminishes the persuasiveness of Mrs. Swick's testimony.

Furthermore, more than three years transpired between August 2011 and October 2014, when Mrs. Swick testified.  The lapse of time with associated decline in memory is an additional factor reducing the overall persuasiveness of Mrs. Swick's testimony.  Regardless of the myriad explanations for the various inconsistencies, the undersigned finds the contemporaneous documentation regarding how J.R.S. was found relative to his blanket more persuasive than Mrs. Swick's later October 2014 testimony.  The undersigned finds that J.R.S. was discovered on August 11, 2011, with a blanket covering his head.

The remaining issues are how J.R.S. was laid to sleep, and J.R.S.'s physiological condition when found.  While no definitive finding can be made, it is possible to narrow the parties' disputes.

Regarding how J.R.S. was laid to sleep, it is unclear whether Mr. Swick placed J.R.S. on his back (supine) or stomach (prone) the morning of August 11, 2011.  Contemporaneous records suggest prone.  See exhibit 6 at 10.  Mr. Swick, however, testified to placing him supine.  Tr. 65.  Mrs. Swick testified that she was unsure how they usually placed him in his crib, and also testified that J.R.S. could roll over.  Tr. 42.  Respondent challenges the contention that J.R.S. could roll over, and notes that it is undisputed that J.R.S. was found in the prone position.  Resp't's Resp. to Pet'r's Proposed Findings of Fact at ¶ 34; exhibit 6 at 8.

In addition to the evidence being unclear, the significance of how J.R.S. was placed to sleep is also unclear.  Therefore, an expert's opinion about causation may draw support from either scenario, that is, J.R.S. was laid to sleep on his back, or on his stomach.  If using either scenario, the expert must thoroughly explain why J.R.S.'s original position upon being placed to sleep matters in his (or her) opinion.

The final issue to address is J.R.S.'s physiological condition, that is, temperature and overall appearance, when Mrs. Swick found him, until the time the EMTs arrived.  Mr. Swick testified that J.R.S. was warm when found the

morning of August 11, 2011.  Tr. 69 to 70.  Mrs. Swick testified that J.R.S. was warm to the touch, sweaty, pale, limp, and still.  Exhibit 6 at 10; Tr. 34 to 37.  She also testified that just before she stopped CPR, the area below J.R.S.'s lips started to turn blue, but his lips were not blue, nor his face.  Tr. 37.  This testimony by the petitioners is credible.  Further, respondent does not dispute the Swicks' subjective impressions.  Resp't's Resp. to Pet'r's Proposed Findings of Fact at ¶¶ 38-40.

While the physiological conditions above are findings of fact, the undersigned declines at this time to draw any further inference from them.  For example, whether J.R.S. was still alive when found depends on all evidence, including expert reports, and cannot be determined based on the evidence currently of record.

## Illness in the Swicks' Home

The Swicks testified that J.R.S. was the only sick family member during the time surrounding his death.  Tr. 24, 53, 78.  Respondent highlights a contemporaneous notation in the medical examiner's report which asks, "Anyone Else in Household or Other Contacts (e.g. daycare) Recently Ill?"  Exhibit 6 at 11.  In response, "Yes" is selected, with a handwritten note stating, "colds both parents and 2 older sibs [siblings] all in past 2 wks."  Id.

The contemporaneous medical examiner's report is persuasive.  The report is more persuasive not only because it is contemporaneous, unlike the Swicks' more recent testimony, but also because it includes a specific notation which identifies the family (both parents and two older siblings) and a timeframe in which the illnesses occurred.  Exhibit 6 at 11.  While a scrivener's error in selecting "yes" or "no" could be imagined, it strains reasonableness to argue that not only did the person completing the form err in selecting yes or no, but went so far as to provide details to support the erroneous marking.  Given the greater persuasiveness of the medical examiner's contemporaneous report, the undersigned finds the preponderance of the evidence supports that both J.R.S.'s parents and two older siblings were sick at some point during the two weeks prior to J.R.S.'s death.

## **Specific Findings of Fact**

The undisputed and clarified facts, as listed above, and found in Petitioners' Proposed Findings of Fact and the Response to Petitioners' Proposed Findings of Fact, are adopted by the undersigned as findings of fact.

The undersigned has considered the respondent's additional proposed findings of fact, but finds them to either be a restating of the undisputed existing record, or the domain of expert opining, and therefore does not address them.

Finally, the following findings of fact reflect the determinations concerning the six general areas of dispute above:

### J.R.S.'s Temperament

1.  J.R.S.'s normal temperament was to cry only when hungry, constipated, or his tummy hurt.  Tr. 24.

2.  J.R.S.'s temperament was fussier than normal between June 21 and July 11, 2011.  Exhibit 2 at 10-22.

3.  J.R.S. was constipated for portions of time between June 21 and July 11, 2011.  Exhibit 2 at 10-22.

4.  J.R.S.'s temperament was not fussier than normal, and he was not constipated, between July 12 and July 24, 2011.  See exhibit 2 at 10-22.  However, J.R.S. was experiencing early AM crying episodes during this period.  Id. at 25.

5.  J.R.S.'s temperament after his July 25, 2011 vaccinations was fussier than normal, and comparable to his fussier than normal temperament between June 21 and July 11, 2011.  Tr. 15, 61 to 62; exhibit 7 at ¶ 6; exhibit 15 at ¶ 4.

6.  J.R.S. was constipated for portions of time between July 25 and August 11, 2011.  Tr. 39.

### J.R.S's Cough

7.  J.R.S.'s cough began the evening of August 10, 2011.  Exhibit 6 at 11. The cough was significant enough that it woke J.R.S. from his sleep and compelled the Swicks to give J.R.S. C-Phen.  Tr. 33, 40 to 41.

### Oral Expelling Magnitude

8.  Around July 12, 2011, J.R.S. vomited prior to a bowel movement.  The bowel movement resolved the vomiting issue.  Exhibit 2 at 22.

9.  Four to five days before his death, J.R.S. had a single vomiting incident in which he vomited a significant amount relative to his size and age.  Tr. 73 to 74, 85 to 88.

### C-Phen

10.  The Swicks gave J.R.S. one-quarter milliliter of C-Phen on the morning of August 11, 2011.  Tr. 41.

11.  J.R.S., in response to receiving the C-Phen, spit up.  Tr. 41.

12.  The active ingredients in C-Phen were not found in the toxicology panel performed on J.R.S.'s blood following his death.  Exhibit 6 at 20.

### The Morning of August 11, 2011

13.  Mrs. Swick found J.R.S. with a blanket covering his head.  Exhibit 6 at 8, 10; exhibit 4 at 2; exhibit 7 at ¶ 15(f); exhibit B at 3; exhibit 19 at 5-6.

14.  When Mrs. Swick found J.R.S. he was warm to the touch, sweaty, pale, limp, and still.  Exhibit 6 at 10; Tr. 34 to 37, 69 to 70.  His face and lips were not blue, but the area below J.R.S.'s lips started to turn blue just before Mrs. Swick stopped performing CPR.  Tr. 37.

<u>Illness in the Swicks' Home</u>

15.  The Swicks and J.R.S.'s two older siblings were sick at some point during the two weeks prior to J.R.S.'s death.  Exhibit 6 at 11.

**<u>Conclusion</u>**

The parties are ordered to provide these Findings of Fact to any expert whom they may retain to offer an opinion in this case.  An expert's assumption of any fact that is inconsistent with these findings of fact will not be credited.  <u>Burns v. Sec'y of Health & Human Servs.</u>, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that the special master did not abuse his discretion in refraining from conducting a hearing when the petitioner's expert "based his opinion on facts not substantiated by the record").

A status conference is set for **Wednesday, January 20, 2016 at 11:30 A.M. Eastern Time.**  The parties should be prepared to discuss the next step in this case.

**IT IS SO ORDERED.**

<u>S/Christian J. Moran</u>
Christian J. Moran
Special Master